UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CLARENCE FISCHER,

        Plaintiff,

vs.                                        Case No.  2:03-cv-453-FtM-99DNF

CAPTAIN ELLEGOOD, SERGEANT RIES,
OFFICER POOSER, OFFICER HOLLAND,
OFFICER MAYS, SGT. LAFAYETTE,

        Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court upon Defendants Ellegood, Ries, Pooser, Holland, Mays, and Lafayette's Motions for Summary Judgment. (Docs. #90, 91.) Defendants contend that as a matter of law they are entitled to summary judgment in their favor. Defendants attach a number of affidavits and documents in support of their Motion. Plaintiff was advised of Fed. R. Civ. P. 56. (See Doc. #40.) Plaintiff filed a Response to Defendants' Motions with exhibits. (Doc. #99.) Thus, this matter is now ripe for review.

### I. Background

*Pro se* Plaintiff, who is currently incarcerated at the Lee County Jail,[1] filed a civil rights complaint form on August 11, 2003, in the United States District Court for the Southern District

_____

[1]As of August 2006, the Lee County Sheriff's website indicates that Plaintiff remains in custody at the jail.

of Florida, which was subsequently transferred to this Court.  On
October 14, 2003, Plaintiff filed an Amended Civil Rights Complaint
form pursuant to 42 U.S.C. § 1983 (Doc. #19) and subsequently filed
a Second Amended Complaint form on November 28, 2003 (Doc. #28).
The Second Amended Complaint alleges First, Eighth, and Fourteenth
Amendment violations stemming from an April 23, 2003, incident
occurring while Plaintiff was held as a detainee at the Lee County
Jail.  (Doc. #28, pp. 4-5.)

Plaintiff's allegations, as set forth in his Second Amended
Complaint, are as follows:  On April 23, 2003, Defendant Ries
ordered all white inmates and all black inmates into separate
cells.  (Id. at 5.)  Plaintiff states that the inmates were
segregated by race without incident.  (Id.)  Defendant Pooser then
locked the inmates down into four separate cells.  (Id.)
Defendants Pooser, Holland, Mays and Officer Richards began shaking
down every inmate in every cell.  (Id.)  Although the cells were
designed for four inmates, some of the cells contained seven
inmates.  (Id.)  One of the cells had broken plumbing.  (Id.)

Plaintiff also asserts that the inmates remained in the cells
for two weeks without any showers or their personal belongings.
(Id.)  The inmates were forced to sleep on the floor on other
inmates' mattresses and soiled linens.  (Id. at 6.)  During this
time, some of the inmates engaged in "urine throwing and spitting"
on each other, some of which struck Plaintiff.  (Id. at 8.)  The
officers failed to make regular or scheduled cell block checks.

(Id.)   Because of the overcrowded conditions and lack of supervision, Plaintiff asserts that a fight occurred, during which he was injured.   (Id.)   Plaintiff also states that he and other inmates watched as guards beat certain inmates without cause.   (Id. at 10.)

On April 27, 2003, Plaintiff filed an administrative grievance[2] complaining about the conditions of confinement. Plaintiff states that due to the grievance he incurred a retaliatory shake down, during which Plaintiff alleges that Defendant "Lafayette instructed the Officers to 'make sure they get something in their face.'"   (Id. at 9.)   Plaintiff states he was "overcome by the Defendants use of pepper spray, which he was sprayed with." (Doc. #90-2, p. 6.)   Additionally, Plaintiff states that in retaliation for filing the Complaint *sub judice*, the jail stopped all of Plaintiff's medications for Plaintiff's physical and mental conditions.   (Id. at 11.)   Because Plaintiff has not had his prescriptions for his mental conditions, Plaintiff claims he has been involved in altercations, which have resulted in injuries,

---

[2]Plaintiff states that he filed a grievance and obtained other inmates' signatures. Plaintiff states that he filed a formal grievance to Captain Ellegood, but the formal grievance went unanswered.   (Id. at 9-10.)   The only grievance Plaintiff attached to the Complaint was a formal grievance and there was no response written on the grievance.   Captain Ellegood admits that due to an administrative error, he never responded to the grievance because he did not receive it.   (Doc. #90-1, p. 4.)

such as a broken nose.  (Id. at 11.) Plaintiff seeks five million dollars in damages.[3]  (Id. at 6.)

On March 28, 2005, Defendants filed a Motion for Summary Judgment as to Official Capacity Claims and Incorporated Memorandum of Law (hereinafter "Official Capacity Motion" Doc. #91-1) and a Motion for Summary Judgment as to Individual Capacity Claims and Incorporated Memorandum of Law (hereinafter "Individual Capacity Motion" Doc. #90-1).  Uncontroverted evidence submitted by Defendants reveal that nine named inmates submitted a grievance form dated April 23, 2003, to jail officials warning that specifically identified inmates in the block were "constantly fighting others, stealing everyone's Canteen, regulating and charging for others to use the telephone and [to] watch tv." (See Doc. #90-4, Inmate grievance form.)  Attached to the grievance was a note stating, "Please follow up with this [.]  They have shanks and they said if we don't give [them] our canteen and trays [,] they will cut us after lights out.  We fear for our lives [.]" (Id.)  Although the inmate grievance form does not indicate that the conflict was racially divided, other evidence submitted by defendants indicate that the black inmates were threatening the white inmates.  The inmates were segregated by race and searched, during which the officers recovered contraband.  (See Doc. #90-4: Aff. Pooser, Aff. Holland.)  The search occurred because the

---

[3]The Second Amended Complaint does not specify whether the requested damages are compensatory or punitive.

inmates refused to return food trays. (Doc. #92-4 Aff. of Lafayette.) The officers were authorized to use O.C. spray during the search against any inmate who did not face against the wall as instructed. (Doc. #92-4 p. 2.) Three identified inmates received O.C. spray due to their refusal to follow the officers' orders. (Id.) Any spray that Plaintiff received was secondary and unintentional. (Id.)

Moreover, it is uncontested that the segregation occurred for six days, from April 23, 2003 thru April 30, 2003.[4] (See Doc. #90-4, Aff. Pooser, Aff. Holland, Log entry.) The entire jail was not segregated, rather only one location, Block 2A,[5] was locked down and segregated. All the black inmates were placed in one cell while the hispanic and white inmates were placed in remaining cells together. (Doc. #92-3, Aff. Ellegood.) The inmates housed in this specific cellblock were the subject of the inmate internal grievance form, which indicated that the white inmates feared for their lives. Further, during the segregation on April 23, 2003,

---

[4] The Complaint stated that the segregation occurred for two weeks. (See Complaint, p. 5.) However, in Plaintiff's Response to Defendants' Motion for Summary Judgment, Plaintiff does not attach any evidence contesting Defendants' evidence that the segregated lock down took place for only six days.

[5] It is unclear whether the segregation occurred in Block 3H, as referenced by Captain Ellegood, or Block 2A , as referenced by Defendants Pooser, Holland, Ries and Officer Lineberger. (Cf. Docs. #92-3 with # 90-4 exhibits C-A, C-B, C-F, C-K.) However, based on the Complaint, it appears that Block 3-H was Plaintiff's original cell. (Complaint, p. 10.) Irrespective, only one cellblock was subject to the lock down and segregation.

several inmates completed affidavits indicating that they were threatened by specifically identified inmates. (Doc. #90-4, pp. 16-21.) The inmates were taken off lock down and desegregated after a jail supervisor completed an investigation and believed that no continued threat existed. (Doc.# 92-3, Aff. Ellegood.)

With regard to the conditions of confinement, Defendant Pooser, an officer who conducted the initial searches, stated that no inmate complained of being deprived of their mattresses or linens. (Doc. #90-4.) The Lee County Jail's policies require that inmates in confinement must shower at least twice a week and this policy was followed in the subject incident (Doc. #92-3, p. 3). However, when Defendant Ellegood answered Plaintiff's interrogatories, Defendant stated that specific dates and times of showers were "currently unknown." (Doc. #90-3, p. 5.) Only seventeen inmates were housed in 3-H during the incident. (Doc. #92-3 p. 2.) Each cell can accommodate 5 inmates and at no time during the incident did any cell have more than 5 inmates. (Id.)

## II. Standard of Review

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue at to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law.  (Id.)

The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Rice-Lamar v. City of Ft. Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000), cert. denied 534 U.S. 815 (2001).  In order to avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial motion.  Celotex Corp., 477 U.S. at 322; Hilburn v. Murata Elecs. N.Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).

In ruling on a motion for summary judgment, the Court is required to consider the evidence in the light most favorable to the nonmoving party.  Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000); Jaques v. Kendrick, 43 F.3d 628, 630 (11th Cir. 1995).  The Court does not weigh conflicting evidence or make credibility determinations.  Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d at 1225.  "If the record presents factual issues, the court must not decide them; it must

deny the motion and proceed to trial." Tullius v. Albright, 240 F.3d 1317, 1320 (11th Cir. 2001)(citing Clemons v. Dougherty County, 684 F.2d 1365, 1369 (11th Cir. 1982)). However, "the mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003). A genuine issue of material fact exists only if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor. (Id.)

### III. Analysis

Title 42 U.S.C. § 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." To state a claim under 42 U.S.C. § 1983, Plaintiff must allege: (1) Defendants deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998); U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001). In addition, Plaintiff must allege and establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation. Marsh, 268 F.3d at 1059; Swint v. City of Wadley, 51 F.3d 988 (11th Cir. 1995); Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1541 n.1 (11th Cir. 1994). A defendant who occupies a supervisory position

-8-

may not be held liable under a theory of *respondeat superior* in a § 1983 action.  Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690-692 (1978); Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir. 2003); Farrow v. West, 320 F.3d 1235 (11th Cir. 2003).

Plaintiff's Second Amended Complaint sets forth five distinct claims: (1) a First Amendment claim for the retaliatory shakedown based on Plaintiff's filing of a formal grievance dated April 27, 2003; (2) an Eighth Amendment claim for the use of chemical spray during the shakedown; (3) a First Amendment claim for retaliation for denying Plaintiff his prescriptions because Plaintiff filed the Second Amended Complaint *sub judice*; (4) a Fourteenth Amendment Equal Protection claim stemming from the racial segregation of the inmates; and (5) an Eighth Amendment claim as a result of the conditions of confinement.

## A. Official Capacity Claims

In Defendants' Official Capacity Motion (Doc. #91-1), Defendants argue that they are entitled to Summary Judgment because Plaintiff's Second Amended Complaint does not contain any "allegations that Defendants had any custom or policy that caused a constitutional deprivation against him."  In this case, the defendants are all officers at the Lee County Jail and are employees of the Lee County Sheriff's Office.  In order to pursue a suit against the Lee County Sheriff's Office, the record must

allege a practice, policy, or custom established by the Lee County Sheriff that resulted in injury to Plaintiff.

The Court agrees.  It is well established that a suit against a defendant governmental officer in his or her official capacity is the same as a suit against the entity that employs the officer. See McMillian v. Monroe County, 520 U.S. 781, 785 (1997); Kentucky v. Graham, 473 U.S. 159, 165 (1985); Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986).  The Second Amended Complaint and evidence submitted by Plaintiff fail to establish that the Lee County Jail had a practice, policy, or custom that was a moving force of injury to Plaintiff.  Consequently, Defendants' Motion for Summary Judgment as to Official Capacity Claims is granted.

## B.  Individual Capacity Claims

### 1.  First Amendment Claims - Retaliation

As previously discussed, Plaintiff states that he incurred a retaliatory shakedown and spraying because he filed a formal grievance concerning the segregation.  Additionally, Plaintiff avers that the jail denied his medications in retaliation for filing the Complaint *sub judice*.  Defendants provide evidence that the shakedown was not conducted in retaliation, rather the shakedown occurred when the inmates refused to return their food trays.  Moreover, the jail officials were unable to locate the alleged shank, about which some inmates had warned.

-10-

At the outset, the Court notes that the shakedown occurred on April 26, 2003, and Plaintiff's grievance was written and dated on April 26, 2003.  However, the grievance was not received by jail officials until a day after the alleged retaliatory shakedown (grievance stamped received on April 27, 2003).  Thus, a retaliatory shakedown could not have occurred in response to Plaintiff's grievance because the shakedown occurred before officials received the grievance.

Further, reviewing Plaintiff's April 27, 2003 formal grievance reveals that Plaintiff failed to address, by way of the administrative grievances procedures available at the Lee County Jail, either the shakedown or the use of chemical spray. Additionally, the record does not provide evidence that Plaintiff filed any sort of form, medical requests or grievance forms, addressing the jail officials' alleged retaliatory denial of his medications.  The Court takes judicial notice that the Lee County Sheriff's Office affords inmates with a specific grievance procedure for addressing inmate complaints.  See Lee County's Inmate Rules and Regulation Handbook, p. 11.  Inmate grievances are generally handled "within 20 days of receipt."  (Id.)  Inmates "also have the ability to appeal the grievance."  (Id.)

On April 26, 1996, the President signed into law the Prison Litigation Reform Act ("PLRA"), which amended The Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997e(a), to read as follows:

-11-

> (a) Applicability of administrative remedies. No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility **until such administrative remedies as are available are exhausted.** (emphasis added).

"Congress now has mandated exhaustion in section 1997e(a) and there is no longer discretion to waive the exhaustion requirement." Alexander v. Hawk, 159 F.3d 1321, 1325 (11th Cir. 1998). The Court should enforce this requirement *sua sponte*. Brown v. Toombs, 139 F.3d 1102 (6th Cir. 1998), cert. denied 525 U.S. 833 (1998); See Salas v. Tillman, 162 Fed. Appx. 918 (11th Cir. 2006)(holding that the district court's *sua sponte* dismissal of Plaintiff's § 1983 claims for Plaintiff's failure to exhaust was not an abuse of discretion). Moreover, in Porter v. Nussle, 534 U.S. 516 (2002), the Court made clear that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and whether they involve excessive force or some other wrong doing. See Booth v. Churner, 532 U.S. 731, 741 (2001)(finding that Congress has mandated exhaustion of administrative remedies, regardless of whether the relief offered through the administrative procedures is available). In determining whether a plaintiff has exhausted his administrative remedies, a court does "not review the effectiveness of those remedies, but rather whether remedies were available and exhausted." Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999)

(citing <u>Alexander</u>, 159 F.3d 1326); <u>Brown v. Sikes</u>, 212 F.3d 1205, 1208 (11th Cir. 2000).  The PLRA requires "proper exhaustion" in that the jail's grievance procedure must be properly completed before filing suit in federal court.  <u>Woodford v. NGO</u>, 126 S. Ct. 2378 (2006).

The unrefuted record in this action establishes that Plaintiff never filed a grievance regarding any retaliatory actions after the alleged incidents took place.  Instead it appears that Plaintiff attempted to satisfy the exhaustion requirements by grieving "potential" retaliatory actions before they occurred.  In his formal grievance, Plaintiff states:

> I . . . feel that if any negative actions or movements into other housing are taken against me, **now or in the future,** it will be an act taken in retaliation for the exercise of a constitutionally protected right under the First Amendment and will give rise to a claim under the Civil rights complaint act pursuant to 42 U.S.C. 1983.

(Doc. #28, p. 16)(emphasis added).  It is not sufficient that Plaintiff filed one grievance asserting potential retaliation claims.  The administrative grievance procedures are important for effectively determining how the facility has addressed the issues presented to it, thus it is necessary for Plaintiff to comply fully with the procedures established at his institution.  Because full, complete, and proper exhaustion is a pre-condition to suit, the Court *sua sponte* dismisses Plaintiff's retaliation claims.

## 2. Eighth Amendment Claim - Use of Chemical Spray

To the extent that Plaintiff raises an Eighth Amendment claim for the chemical spraying that occurred during the alleged retaliatory shakedown, the record fails to establish that Plaintiff suffered any type of physical injury. To begin with, 42 U.S.C. § 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotionally injuries suffered while in custody without a prior showing of physical injury." Other than stating that "I [Plaintiff] and others received pepper spray," the record fails to state the extent, if any, that Plaintiff was sprayed or whether Plaintiff incurred an injury from the alleged pepper spraying incident. Further, if Plaintiff was injured by the pepper spray, the record is void of any evidence that Plaintiff visited the medical unit.

Admittedly, a prisoner need not suffer a serious injury to establish an Eighth Amendment violation for the excessive use of force. Hudson v. McMillian, 503 U.S. 1 (1992). To establish an Eighth Amendment claim, the initial inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. at 6 (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)(citation omitted)). Defendant Lafayette admitted that she authorized officers to use O.C. spray due to the ongoing threat that an inmate had a shank and the inmates' refusal to follow

orders.   Defendants produced evidence, including a spray report log, indicating that three inmates, Armstrong, Croker, and Delamos, were sprayed with O.C. spray after they refused to face the wall during the shakedown.   Defendant Lafayette stated:

> While conducting the shakedown, Sgt. Maddox attempted to speak with inmate Leroy Armstrong.  Mr. Armstrong was belligerent during the shakedown and told Sgt. Maddox, "Fuck you punk motherfucker, get the fuck away from my cell.  If I catch your punk ass on the street I'm going to put a bullet in your head."  Officer Anthony Croker then attempted a pat down search of Inmate Armstrong for contraband.  Mr. Armstrong pulled away from Officer Croker. Officer Croker and Officer Guffey then escorted Mr. Armstrong away from the other inmates.  Mr. Armstrong was given several orders to stop resisting and face the wall or he would be O.C. sprayed.  Mr. Armstrong refused all orders causing Officer Croker to spray him with O.C. spray to gain control . . . Mr. Armstrong was taken to the nurse for treatment and was cleared.  At approximately the same time that Mr. Armstrong was resisting our shakedown efforts, another inmate in the same cell, Jorge Delamos, was also resisting . . . Mr. Delamos continued to resist causing Officer Dundon to spray him with O.C. Spray . . . He was taken to see a nurse for treatment and was cleared.

(Doc. #92-4, Aff. Lafayette, pp. 2-3.)  Based on this affidavit, the Court determines that the shakedown and subsequent spraying of three identified inmates was applied in good faith to restore order.  The record fails to establish that the O.C. spray was used for any other purpose other than to restore order.  Moreover, the record establishes that Plaintiff did not incur any injury from the spraying of the other three inmates.  For these reasons, the Court grants Defendants' Motion for Summary Judgment with regard to Plaintiff's Eighth Amendment claim for failure to satisfy the

requirements set forth in either 42 U.S.C. § 1997e(e) and the Eighth Amendment.

### 3. Equal Protection Claim - Segregation

Plaintiff asserts a Fourteenth Amendment Claim for violation of Equal Protection stemming from the Defendants segregating the prisoners by race.  The Supreme Court has held that government-based racial classifications must be analyzed by the reviewing court under strict scrutiny.  Johnson v. California, 543 U.S. 499, 505 (2005)(citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995)).  "Under strict scrutiny, the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling government interests.'"  Adarand Constructors, Inc., 515 U.S. at 227.  This heightened standard of review applies even when evaluating racial segregation in prisons. Lee v. Washington, 390 U.S. 333 (1968).  However, the Supreme Court has recognized that "prison authorities have the right, acting in good faith in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails."  Id. at 334.  Nevertheless, even when prison security is at issue, racial classifications must be narrowly tailored to further a compelling government interest. Johnson, 543 U.S. at 512-513.

As previously discussed, uncontroverted evidence submitted by Defendants reveal that on April 23, 2003, jail officials received

-16-

a grievance, signed by nine named inmates, warning that specifically identified inmates in the block were threatening other inmates. Although the inmate grievance form does not indicate that the conflict was racially divided, other evidence submitted by the defendants state that the black inmates were threatening the white inmates. Thus, Defendant Ellegood believed that the most effective way to ensure the safety of the inmates and jail personnel was to separate the inmates by race until the matter was investigated. Moreover, the officers recovered contraband during the search.

In a prison setting, safety and security constitute a compelling government interest. Johnson, 543 U.S. at 500. "[C]entral to all other corrections goals is the institutional consideration of internal security within the correctional facilities themselves." Pell, 417 U.S. at 823. Nevertheless, it is necessary to evaluate whether the segregation of inmates was narrowly tailored to serve that end.

It is uncontested that the segregation occurred for six days, from April 23, 2003 thru April 30, 2003. The entire jail was not segregated, rather only one location, Block 2A, was locked down and segregated. All the black inmates were placed in one cell while the hispanic and white inmates were placed in remaining cells together. The inmates housed in this specific cellblock were the subject of the inmate internal grievance form, which indicated that the white inmates feared for their lives. The inmates were taken off lock down and desegregated after a jail supervisor completed an

investigation and believed that no continued threat existed. Accordingly, the Court finds that the racial segregation was narrowly tailored, conducted for temporary purposes while officers investigated the race-based threats.

"[O]nly a social emergency rising to the level of imminent danger to life and limb- for example, a prison race riot, requiring temporary segregation of inmates can justify an exception to the principle embodied in the Fourteenth Amendment that '[o]ur Constitution is colorblind, and neither knows nor tolerates classes among citizens.'" City of Richmond v. J.A. Croson Co., 488 U.S. 469, 521 (1989)(quoting Plessy v. Ferguson, 163 U.S. 537, 559 (1896)). Based on a review of the record, the Court finds that in this case the Defendants, in good faith, believed that there was a "social emergency" due to the threat of violence in the jail based on race, thus justifying the temporary segregation of white inmates from black inmates. J.A. Croson Co., 488 U.S. at 521. Consequently, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's Fourteenth Amendment Claim for violation of Equal Protection.

### 4. Eighth Amendment Claim - Prison Conditions

Plaintiff claims violations of the Eighth Amendment with respect to the conditions of the segregated cell in which Plaintiff was temporarily confined for six days.[6] The "cruel and unusual

---

[6]Plaintiff's rights as a detainee arise from the Fourteenth
(continued...)

punishment" standard, which originally proscribed barbarous methods of punishment, has evolved to reflect society's "standards of decency." Rhodes v. Chapman, 452 U.S. 337, 345-46 (1981), Estelle v. Gamble, 429 U.S. 97, 102 (1976).  The court employs a two-part analysis in determining whether the conditions of a plaintiff's confinement violates the Eighth Amendment.  Hudson, 503 U.S. at 8. First, the condition must be objectively and sufficiently serious or "extreme" to show that it "pose[s] an unreasonable risk of serious damage to [a plaintiff's] future health or safety." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004).  Second, a plaintiff must come forward with some factual allegations to show that the defendant official "acted with a sufficiently culpable state of mind." Id. (citing Hudson, 503 U.S. at 8).  Negligence is not enough. Chandler, 379 F.3d at 1289.  Rather, a plaintiff must show the a defendant acted with "deliberate difference."  Id. Significantly, a defendant must: (1) have subjective knowledge of a risk of harm; (2) disregard that risk; and (3) engage in conduct that rises above mere negligence.  The Court employs a "totality of conditions" test to determine if the conditions of confinement amount to a constitutional deficiency. Wilson v. Blankenship, 163 F.3d 1284 (11th Cir. 1998); Hamm v. DeKalb County, 774 F.2d at

[6](...continued)
Amendment, though the case law developed with regard to the Eighth Amendment prohibitions against cruel and unusual punishment is analogous. Cook ex. re Estate of Tessier v Sheriff of Monroe County, 402 F.3d 1092, 1115 (11th Cir. 2005). See also Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985).

1576.  Based upon the unrefuted evidence presented by Defendants, Plaintiff was held in a cell with four other inmates, permitted to shower twice a week, and required to sleep on a mattress on the floor for six days.  Although Plaintiff alleges that one of the cells had broken plumbing, he does not allege, yet alone demonstrate that he was in that cell, nor does it state how long the plumbing was not functioning.

The Constitution does not mandate comfortable prisons and even if Plaintiff is correct, a Constitutional violation is not established.  Rhodes v. Chapman, 452 U.S. 337, 348 (1981) (holding that double celling does not constitute an Eighth Amendment violation); Hutto v. Finney, 437 U.S. at 686 (considering the duration of confinement and the conditions); Hamilton v. Lyons, 74 F.3d 99, 106 (5th Cir. 1996) (finding Plaintiff's allegations that he wad denied items, such as  telephone, mail, sheets, and showers did not constitute an Eighth Amendment violation).  To the extent Plaintiff argues that deprivation of bunks violates the Constitution, the Courts have consistently held that no constitutional claim is shown when inmates are required to sleep on the floor and are provided with a mattress because the Constitution does not "require elevated beds for prisoners." Mann v. Smith, 796 F.2d 79, 85 (5th Cir. 1986); Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985); Crowe v. Leeke, 540 F.2d 740, 740-41 (4th Cir. 1976).

Further, Plaintiff complains that whenever Defendants did a shakedown, the mattresses were "removed and jumbled together every time." (Doc. #99, p. 9.)  "Some prisoners may have suffered from diseases, some infectious such as hepatitis and venereal disease, and the inmates and [P]laintiff were forced to sleep on others' mattresses and linen[s]." (Id.)  Plaintiff's complaint sounds strikingly familiar to one of the situations[7] described in Hutto v. Finney, 437 U.S. 678 (1979); however, Hutto is factually distinguishable from the instant case because the totality of the conditions in Hutto were immensely different.

In Hutto, the district court held that the conditions faced by Arkansas prisoners violated the Eighth Amendment. Id. at 680.  On appeal to the Eighth Circuit, Petitioners challenged only two aspects of relief, the first involving the district court's order that thirty days was the maximum amount of time that an inmate could remain in punitive isolation and the other concerned the award of attorney's fees. Id.  The Supreme Court affirmed the lower court's holding. Id. at 700.  With respect to the first issue, the Supreme Court reviewed the facts upon which the district court relied to find a violation of the Eight Amendment. Id. at

---

[7]In Hutto, inmates in punitive isolation "were given mattresses to spread on the floor at night.  Although some prisoner suffered from infectious diseases such as hepatis and venereal disease, mattresses were removed and jumbled together each morning, then returned to the cells at random in the evening." 437 U.S. at 682-683 (citing Holt v. Sarver, 300 F. Supp. 825, 832 (E.D. Ark. 1969)).

681-684.   In addition to the prisoners sleeping on others'
mattresses, *inter alia*, the prisoners in <u>Hutto</u> were subjected to
long work hours in all sorts of weather, lashed with a wooden-
handled strip, and administered electrical shocks. <u>Id.</u> at 682
(citing <u>Holt</u>, 363 F. Supp. 194 (E.D. Ark. 1973)(<u>Holt III</u>); <u>Holt</u>,
309 F. Supp. 362 (E.D. Ark. 1970)(<u>Holt II</u>); <u>Holt</u>, 300 F. Supp. 825
(E.D. Ark. 1969)(<u>Holt I</u>); <u>Jackson v. Bishop</u>, 268 F. Supp. 804 (E.D.
Ark. 1967); <u>Talley v. Stephens</u>, 247 F. Supp. 683 (E.D. Ark. 1965)).
Clearly the instant case is factually distinguishable from <u>Hutto</u>.

In the instant case, the Court finds that the conditions
Plaintiff describes do not constitute cruel and unusual punishment
under the Eighth Amendment.   All of the conditions mentioned by
Plaintiff were temporary, lasting only six days, during which time
an investigation occurred to determine the legitimacy of a
grievance that alleged that the inmates were threatened by other
inmates who had a shank.   "The Eighth Amendment should not be used
to divest prison authorities of administrative discretion necessary
to maintain order and discipline in penal institutions." <u>LaReau v.
MacDougall</u>, 473 F.2d 974, 978 (2d Cir. 1972), <u>cert. denied</u> 414 U.S.
878 (1973).   While the conditions that Plaintiff describes were
less than optimum, they were not so extreme as to have posed an
"unreasonable risk of serious damage" to Plaintiff's health or
safety.   <u>Chandler</u>, 379 F.3d at 1290 (pointing out that Eighth
Amendment violations should not be found upon a judge's subjective

views).   Moreover, the inmates did not endure these alleged conditions as a form of punishment, rather exigent circumstances required that the officers separate and move the inmates from their usual housing arrangements until a legitimate security issue could be resolved.   Therefore, based upon the record in this matter, the Court finds that there is no dispute as to the material facts and that as a matter of law, Defendants are entitled to summary judgment in their favor.   Any other claims not addressed herein are deemed to be without merit.

ACCORDINGLY, it is hereby

**ORDERED:**

1.   Defendants' Motion for Summary Judgment as to Individual Capacity Claims (Doc. #90) is **GRANTED.**

2.   Defendants' Motion for summary Judgment as to Official Capacity Claims (Doc. #91) is **GRANTED.**

3.   The Clerk of Court shall: (1) enter judgment in favor of defendants accordingly; (2) terminate any outstanding motions; and (3) close this file.

**DONE AND ORDERED** in Fort Myers, Florida, on this __21st__ day of August, 2006.

_John E. Steele_
JOHN E. STEELE
United States District Judge

SA: alj
Copies: All Parties of Record

-23-